Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
Jessica D. Hollinger (SBN 344211)
jessica@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

Benjamin Harris (SBN 313193)
Ben@lawaterkeeper.org
Barak Kamelgard (SBN 298822)
Barak@lawaterkeeper.org
LOS ANGELES WATERKEEPER
360 E 2nd Street Suite 250
Los Angeles, CA 90012
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MITSUBISHI CEMENT CORPORATION, a Delaware corporation,<br><br>Defendant. | Case No. _____<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br><br>Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

## I.  **JURISDICTION AND VENUE**

1.     This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et seq*.

2.     This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") and Mitsubishi Cement Corporation, Inc. ("Mitsubishi" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.     This complaint ("Complaint") seeks relief for ongoing violations by Mitsubishi of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ*, as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ*, *Order No. 2014-0057-DWQ,* and as amended on November 6, 2018 ("General Permit"), related to polluted storm water and non-storm water discharges from the construction aggregates distribution facility owned and operated by Mitsubishi at and near 1150 Pier F Avenue, Long Beach, California ("Facility").

4.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration) and 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties).

5.     Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to

enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation or order alleged to be violated, the activity alleged to constitute the violations, the location of alleged violations, and the date or dates of such violations. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.     The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act and, where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.     A copy of the Notice Letter must be mailed to the Attorney General, U.S. Department of Justice ("U.S. DOJ"), the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8.     On November 18, 2022, Plaintiff sent a Notice Letter via certified mail to Mitsubishi and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the Notice Period. A true and accurate copy of the Notice Letter as provided to Mitsubishi is attached to, and incorporated by reference into, this Complaint at EXHIBIT 1.

9. The Notice Letter was received by Tatsuro Teramoto, Mitsubishi's Secretary, on November 21, 2022.

10. The Notice Letter was received by CT Corporation System, Registered Corporate 1505 Agent, Mitsubishi's registered agent for service of process November 22, 2022.

11. The Notice Letter was also received by Merrick Garland, the U.S. Attorney General on November 28, 2022; Michael Regan, Administrator of the U.S. EPA on November 25, 2022; Eileen Sobeck, Director of the State Water Resources Control Board on November 28, 2022; and Renee Purdy, Executive Officer of the L.A. Regional Water Quality Control Board on November 21, 2022.

12. More than sixty (60) days have passed since the Notice Letter was served on Mitsubishi, and the State and Federal agencies.

13. Plaintiff is informed and believes, and thereon alleges, that neither the U.S. EPA nor the State of California has commenced or is diligently prosecuting a court action to redress violations alleged in the Notice Letter and this complaint.

14. Plaintiff's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

15. Venue is proper in the Central District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

LA Waterkeeper, by and through its counsel, hereby alleges:

/ / /

/ / /

## II.  **INTRODUCTION**

16.     This Complaint seeks relief for unpermitted and unlawful discharges of pollutants, polluted storm water, and polluted non-storm water from the Facility to waters of the United States in violation of the Act and General Permit.

17.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Los Angeles' storm drains and contaminate local streams, creeks, rivers, estuaries, harbors, bays, beaches, and coastal waters.

18.     The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See*, *e.g.*, Steven Bay et al., *Study of the Impact of Stormwater Discharge on Santa Monica Bay* (1999).

19.     Numerous scientific studies in recent decades have documented serious health risks to recreational users of Southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See*, *e.g.*, Michael K. Stenstrom, *Southern California Environmental Report Card: Stormwater Impact* 15 (1998); Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* 205 (2000).

20.     A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Robert W. Haile et al., Santa Monica Bay Restoration Project, *An Epidemiological Study of Possible Adverse*

*Health Effects of Swimming in Santa Monica Bay* 5 (1996).

21.     Los Angeles' waterways, including within the Port of Long Beach and connected coastal and ocean waters, are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

22.     Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

23.     Los Angeles' waterways also provide non-contact recreation, aesthetic, and spiritual opportunities, such as hiking, running, biking, and wildlife observation.

24.     Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, trash, and other pollutants contribute to the impairment of surface waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

25.     Discharges of polluted storm water and non-storm water to local surface waters pose carcinogenic, developmental, and reproductive toxicity threats to the public (including LA Waterkeeper members), adversely affect the aquatic environment, and impair the tourist economy on which much of the region depends.

26.     These contaminated discharges can and must be controlled as required by the CWA for ecosystems to regain their health and to protect public health.

27.     Controlling polluted storm water and non-storm water discharges associated with industrial activity is vital to protecting southern California's surface and coastal waters, and essential to LA Waterkeeper's mission.

28.     Defendant is liable under the CWA for its past and ongoing failures to comply with the Act, including failures to comply with the General Permit's discharge prohibitions, technology-based and water quality-based effluent limitations, planning and monitoring requirements, remedial action requirements, and other procedural and substantive requirements. *See* 33 U.S.C. §§ 1342, 1365.

29.     Defendant is liable for daily, monthly, and annual violations of the General Permit since at least November 18, 2017. *See* 33 U.S.C. §§ 1311(a), 1319(d); 40 C.F.R. § 19.4.

## III.   <u>THE PARTIES</u>

### A.   **LA Waterkeeper**

30.     LA Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 360 East 2nd Street, Suite 250, Los Angeles, California.

31.     Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection and defense of the inland and coastal surface and ground waters of Los Angeles County. LA Waterkeeper's mission is to fight for the health of the region's waterways, and for sustainable, equitable and climate-friendly water supplies.

32.     The organization works to achieve this goal through education, outreach, advocacy and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of itself and its members.

33.     LA Waterkeeper members live, work, and recreate in and around the Los Angeles basin, including many who live and/or recreate in and around the greater Los Angeles and Long Beach Harbor waters, specifically an area designated by the State

Board as the "Inner Harbor," as well as the beaches, and nearshore and coastal waters of the Pacific Ocean between Santa Monica and Huntington Beach (collectively, the "Receiving Waters").

34.     LA Waterkeeper members use and enjoy the Receiving Waters to fish, surf, swim, sail, SCUBA dive, kayak, bird/wildlife watch, bike, run, hike, and walk. LA Waterkeeper members also use the Receiving Waters to engage in education and scientific study through pollution and habitat monitoring and restoration activities.

35.     The Facility's unlawful discharge of pollutants into the Receiving Waters, and failure to comply with the General Permit's non-discharge mandates, harm LA Waterkeeper's members and impair their ability to use and enjoy these waters. The interests of LA Waterkeeper and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

36.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

37.     The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

**B.     Owner and/or Operator of the Facility**

38.     Mitsubishi first registered with California's Secretary of State in 1988. *See* Statement and Designation by Foreign Corporation No. 1610219 (March 30, 1988).

39.     Since 2021, Mitsubishi has listed its principal executive office as 151 Cassia Way in Henderson, Nevada (89014), and the principal office in California at 200

South Main St., No. 200, in Corona, California (92882). *See* Corporation—Statement of Information Doc ID No. GW58833 (September 17, 2021).

40. Mitsubishi's General Permit registration documents on file with the State Water Resources Control Board ("State Board") list the address for the operator, legally responsible person, and Facility at 1150 Pier F Avenue in Long Beach.

41. The Facility's primary industrial activities include receiving and distributing cementitious material.

42. Storm water discharges from the Facility flow from at least one discharge point into an area of the greater Los Angeles and Long Beach Harbor Waters designated by the State Board as the "Inner Harbor" (the "Receiving Waters").

43. According to the State Board's online database for NPDES permit compliance filings—the Storm Water Multiple Application and Report Tracking System ("SMARTS")—the Facility participated in the Port of Long Beach ("POLB") storm water pollution control program under Waste Discharge Identification Number 4 19I003628 since at least 2012.

44. Mitsubishi first filed a Notice of Intent to enroll the Facility in the General Permit on June 23, 2015.

45. Mitsubishi has classified industrial activity at the Facility under Standard Industrial Classification ("SIC") code 3241 (Cement, Hydraulic).

46. Mitsubishi conducts general equipment and vehicle maintenance at the Facility, which is an industrial activity not covered by SIC code 3241.

/ / /

/ / /

## IV.   **LEGAL BACKGROUND**

### A.   **The Clean Water Act**

47.   The Act is the primary federal statute regulating the protection of the nation's water. The Act aims to prevent, reduce, and eliminate pollution in the nation's water in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

48.   To accomplish this goal, section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with other enumerated sections of the Act, including prohibition of discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402. *Id*. §§ 1311, 1342(b); *see also* General Permit, § I.A.12.

49.   The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

50.   All unpermitted discharges of polluted storm water associated with industrial activities are violations of the Act. 33 U.S.C. § 1311(a).

51.   Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. *Id.* § 1342(p).

52.   Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. *Id*. § 1342(b).

53.   States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. *Id.*

54.   Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *Id.* §§ 1365(a)(1), 1365(f).

55.   "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; and/or (b) a condition of an NPDES permit such as the General Permit. *Id.* § 1365(f).

56.   A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. *Id.* § 1362(5).

57.   The Act is a strict liability statute. *Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 940 (C.D. Cal. 2009), *citing Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993).

58.   Each violation of any term or condition in an NPDES permit is an independent violation of the Act. 33 U.S.C. § 1311(d). Each separate violation of the Act subjects the violator to a penalty of up to $59,973.00 per day per violation for violations occurring after November 2, 2015. *Id.* §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

59.   Section 505(d) of the Act allows a prevailing or substantially prevailing

party to recover litigation costs, including fees for attorneys, experts, and consultants where the court finds that such an award is appropriate. 33 U.S.C. § 1365(d); *see also St. John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1062–64 (9th Cir. 2009) (holding that the court's discretion to deny a fee award to a prevailing plaintiff is narrow, and denial is "extremely rare.").

### B.   California's Storm Water Permit

60.   The State Board is charged with regulating pollutants to protect California's water resources, Cal. Water Code § 13001, and is designated as the state agency for all purposes stated in the CWA, *id.* § 13160(a).

61.   California is authorized by U.S. EPA to issue NPDES permits for storm water discharges associated with industrial activities. U.S. EPA, *NPDES State Program Authority*, https://www.epa.gov/npdes/npdes-state-program-authority (last updated on Jan. 3, 2023); *see* 33 U.S.C. § 1342(b); 40 C.F.R. § 122.28(a).

62.   The relevant NPDES permit in this action is the General Permit, which is issued by the State Board and implemented and enforced by Regional Board Water Quality Control Boards, including the Los Angeles Regional Water Quality Control Board ("Regional Board").

63.   In order to discharge storm water lawfully, certain industrial dischargers in California must obtain coverage under the General Permit and comply with all its terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also* General Permit, § I.A.12.

64.   Facilities undertaking industrial activities classified under Standard Industrial Classification code 3241 are required to apply for, and obtain coverage

under, the General Permit by submitting a Notice of Intent to the State Board. General Permit, § I.A.12; General Permit, Attachment A, § 2.

65.     The Notice of Intent serves as certification to the State of California that the industrial facility owner(s), operator(s), and/or agent(s) have read the General Permit and will comply with all its terms and conditions.

66.     The General Permit's annual compliance period runs from July 1 of each calendar year to June 30 of the subsequent calendar year ("Reporting Year"), e.g. July 1, 2022 through June 30, 2023.

67.     Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges. 33 U.S.C. § 1311(b)(2)(A), (E).

68.     Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." General Permit, § XXI.A; *see also* General Permit, § I.A.8 ("This General Permit authorizes discharges of industrial storm water […] so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit.").

69.     Permittees that fail to comply with the terms and conditions of the General Permit, therefore, are liable for violations of the Act. *Nw. Envtl. Advocates. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("[T]he plain language [of the CWA] authorizes citizens to enforce all permit conditions."); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151 (9th Cir. 2000) (finding that "the Clean Water Act allows citizen suits based on violations of any conditions of an NPDES permit, even those which are purely procedural.").

70.    Mitsubishi is liable for past and ongoing violations of the General Permit, and civil penalties and injunctive relief are available remedies. *See* 33 U.S.C. §§ 1311, 1342.

**C.    The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

71.    The General Permit contains the following three sections restricting the discharge of pollutants in storm water from the Facility: (1) Discharge Prohibitions; (2) technology-based effluent limitations; and (3) water quality-based effluent limitations.

1.  Discharge Prohibitions

72.    The General Permit's Discharge Prohibitions include the prohibition of any "discharges of liquids or materials other than storm water" (e.g., vehicle or building wash water, industrial particulates, water used for dust suppression, chemical spills, trash) not otherwise authorized by another NPDES permit, either directly or indirectly to waters of the United States. General Permit, § III.B.

73.    The General Permit's Discharge Prohibitions also prohibit storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code. General Permit, § III.C.

74.    The General Permit's Discharge Prohibitions further prohibit discharges that violate any discharge prohibitions contained in any applicable Regional Water Board Water Quality Control Plans, or any statewide water quality control plans and policies. General Permit, § III.D.

2. <u>Technology-Based Effluent Limitations</u>

75.     The General Permit contains technology-based effluent limitations that set the floor for pollution reduction, i.e., the minimum level of pollution reduction that must be achieved by all permittees, regardless of the quality of water to which a permittee facility discharges. General Permit, § V; *see also* General Permit, Fact Sheet § II.D.31 ("[Clean Water Act] Section 301(b)(1)(A) requires that discharges from existing facilities must, *at a minimum*, comply with technology-based effluent limitations based on the technological capability of Dischargers to control pollutants in their discharges." (emphasis added)).

76.     The General Permit's technology-based effluent limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of pollution controls that achieve the Best Available Technology Economically Achievable ("BAT") in the industry for toxic or non-conventional pollutants, and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit, § V.A, Fact Sheet § II.D.5; *see* 40 C.F.R. §§ 401.15–.16 (listing conventional and toxic/non-conventional pollutants).

77.     Compliance with the General Permit's technology-based effluent limitations requires permittees to design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges consistent with BAT/BCT pollution reduction industry standards. General Permit, § V.A; General Permit, Fact Sheet § II.D.5 ("Dischargers must implement BMPs that meet or exceed the BAT/BCT technology-based standard.").

78.     Best Management Practices are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. Best Management Practices include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility. 40 C.F.R. § 122.2.

79.     Permittees must design Best Management Practices that meet the BCT standard for all sources of conventional pollutants, including total suspended solids, oil and grease, and pH. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(1)(A); *see* 40 C.F.R. § 401.16 (listing conventional pollutants).

80.     Permittees must thereafter implement and maintain, as well as evaluate and improve, their Best Management Practices to ensure that the concentration of conventional pollutants in any storm water discharge is controlled consistent with the BCT standard. General Permit, Fact Sheet § II.D.5.

81.     Permittees must design Best Management Practices that meet the BAT standard for all sources of toxic pollutants. General Permit, Fact Sheet § I.B; 33 U.S.C. § 1311(b)(2)(A); *see* 40 C.F.R. § 401.15 (listing toxic pollutants).

82.     Permittees must implement and maintain, as well as evaluate and improve, those Best Management Practices to ensure that the concentration of any toxic pollutant in any storm water discharge is reduced consistent with the BAT standard. General Permit, Fact Sheet § II.D.5.

83.     Multiple pollutants discharged and/or emitted (or potentially discharged/emitted) from the Facility are classified as toxic pollutants pursuant section 307(a)(1) of the Act, including without limitation arsenic, cadmium,

chromium (VI), copper, lead, nickel, and zinc. *See* 40 C.F.R. § 401.15.

84. The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmark pollutant concentrations for industrial storm water discharges ("U.S. EPA Benchmarks"). U.S. EPA, National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit (MSGP) for Storm Water Discharges Associated with Industrial Activity § 4.2.2 (as modified Mar. 1, 2021).

85. U.S. EPA Benchmarks are objective numeric standards for evaluating whether the Best Management Practices designed and implemented at a facility achieve the statutory BAT/BCT standard. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766–64767 (Oct. 30, 2000).

86. Discharges of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2nd 914, 921–25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

87. Table 1 contains some of U.S. EPA Benchmarks relevant to the assessing the Facility's compliance with the BAT/BCT standard.

/ / /

/ / /

/ / /

/ / /

**TABLE 1**
U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| POLLUTANT | 2015 BENCHMARK | 2021 BENCHMARK |
|---|---|---|
| TSS | 100 mg/L[1] | 100 mg/L |
| copper | 0.0048 mg/L | 0.0048 mg/L |
| lead | 0.21 mg/L | 0.21 mg/L |
| zinc | 0.09 mg/L | 0.09 mg/L |
| nitrate plus nitrite ("N+N") | 0.68 mg/L | 0.68 mg/L |

88.     Records of visual observations required to be maintained by the General Permit are relevant to assessing a permittee's compliance with the BAT/BCT standard.

89.     Best practices within an industrial category, and/or implemented at similar industrial facilities, are relevant measures for evaluating whether a permittee's Best Management Practices comply with the BAT/BCT standard.

3.   Water Quality-Based Effluent Limitations

90.     In addition to complying with the General Permit's technology-based effluent limitations, permittees are required to meet "any more stringent [water quality-based limitations] necessary for receiving waters to meet applicable water quality standards." General Permit, § I.D.31; *see also* 33 U.S.C. § 1311(b)(1)(C).

91.     Unlike the General Permit's technology-based effluent limitations, compliance with water quality-based effluent limitations (a.k.a., "Receiving Water Limitations") depends on the status of surface waters receiving a given facility's storm water discharge.

92.     Receiving Water Limitations are intended to protect designated

---

[1] mg/L = milligrams per liter.

beneficial uses of surface waters to which a facility discharges storm water. General Permit, § VI.A.

93.     Beneficial uses of the Receiving Waters are defined in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties* ("Basin Plan"), promulgated by the California Regional Water Quality Control Board, Los Angeles Region 4 and most recently amended February 13, 2020.

94.     Existing and potential designated beneficial uses of the Los Angeles/Long Beach Inner Harbor include: Water Contact Recreation; Non-contact Water Recreation; Industrial Service Supply; Navigation; Commercial and Sport Fishing; Marine Habitat; Rare, Threatened, or Endangered Species; and Shellfish Harvesting. Basin Plan, Table 2-3, 2-3(a).

95.     In California law, "water quality objectives" are the numeric or narrative water quality levels established for the "reasonable protection of the beneficial uses and the prevention of nuisance." Cal. Water Code §13050(h).

96.     Under federal law, the combination of a designated beneficial use and the water quality objective (or criterion) set to protect the use results in what is referred to as a "water quality standard." 40 C.F.R. §131.2 and §131.3(i).

97.     Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to instream exceedances of a water quality standard are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act and placed on the "303(d) List." 33 U.S.C. § 1313(d).

98.     According to the State Board's 2020–2022 Integrated 303(d) List of

Impaired Water Bodies, the Los Angeles/Long Beach Inner Harbor is impaired for copper, Dichlorodiphenyltrichloroethane (DDT), Polychlorinated Biphenyls (PCBs), Toxicity, zinc, Benthic Community Effects, Benzo(a)pyrene, and Chrysene (C1-C4).

99. Once placed on the 303(d) List, the CWA requires the U.S. EPA or the state to prepare a total daily maximum load ("TMDL") designed to restore the water quality in a water body (or segment) to support designated beneficial uses. 33 U.S.C. § 1313.

100. The General Permit must contain "effluent limits [that] are consistent with the assumptions and requirements of any available wasteload allocation for the discharge." 40 C.F.R. § 122.44(d)(1)(vii)(B).

101. A TMDL specifies the maximum amount of a pollutant that a waterbody (or segment) can receive and still meet water quality standards; and then allocates pollutant loadings to point and non-point sources, as waste load allocations ("WLAs") and load allocations ("LAs"), respectively.

102. The Los Angeles Regional Water Quality Control Board ("LA Regional Board") approved an Amendment to the Water Quality Control Plan – Los Angeles Region ("Basin Plan") to incorporate the Total Maximum Daily Load for Toxic Pollutants in Dominguez Channel and Greater Los Angeles and Long Beach Harbor Waters ("Dominguez/Harbor Waters TMDL").

103. "The goal of the Dominguez/Harbor Waters TMDL is to protect and restore fish tissue, water and sediment quality [] by remediating contaminated sediment and controlling the sediment loading and accumulation of contaminated sediment in the Harbors." Attachment A to Resolution No. R11-008 (May 5, 2011) at

2.

104.   The Dominguez/Harbor Waters TMDL assigns WLAs to "Responsible Parties," which include "Individual and General Stormwater Permit Enrollees," e.g., the General Permit.

105.   The Mitsubishi Facility is an enrollee in the General Permit.

106.   In 2018, the State Board re-opened the General Permit "to amend Attachment E [and] the Fact Sheet [to incorporate enforceable] TMDL-specific [] requirements," including interim and final allocations set in the Dominguez/Harbor Waters TMDL. General Permit § I.F.42; *see also* General Permit Fact Sheet § II.F.6.h.iv.

107.   Attachment E to the General Permit includes interim requirements applicable to storm water discharges from the Facility. *See* General Permit Fact Sheet § II.F.6.h.iv ("The [Dominguez/Harbor Waters TMDL] assigns an interim concentration-based WLA for copper, lead, and zinc…to be met at the facility's industrial discharge location(s)[,] and apply at this time.")

108.   To implement the interim requirements of the Dominguez/Harbor Waters TMDL, the General Permit "associates receiving water bed toxicity targets to discharges of…metals bound to sediment particulates. Therefore, [] interim allocation for discharges to [the Inner Harbor] is addressed by complying with th[e] General Permit's [Total Suspended Solid Numeric Action Level] requirements [] to prevent sediment-bound particulates from settling into the receiving water bed." General Permit Fact Sheet § II.F.6.h.iv.

109.   The General Permit's Numeric Action Level for Total Suspended Solids,

which is based on and identical to the U.S. EPA Benchmark for Total Suspended Solids, is 100 mg/L.

110.   Storm water discharges from the Facility to the Inner Harbor containing Total Suspended Solid concentrations exceeding 100 mg/L are violations of the General Permit's water quality-based effluent limitations. General Permit § VI.A.

111.   Storm water discharges from the Facility to the Inner Harbor containing Total Suspended Solid concentrations exceeding 100 mg/L are violations of the General Permit's WLA assigned to industrial storm water discharges established in the Dominguez/Harbor Waters TMDL. General Permit § VII.A.

112.   The General Permit contains three Receiving Water Limitations. General Permit, § VI.A–C.

113.   The first Receiving Water Limitation prohibits discharges of storm water associated with industrial activity that causes or contributes to an exceedance of any applicable water quality standards ("WQSs"). General Permit, § VI.A; *see also Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166–1167 (9th Cir. 1999) (holding that industrial storm water discharges must strictly comply with water quality standards).

114.   Water quality standards applicable to the Receiving Waters include without limitation:

(1) the numeric aquatic life and human health criteria set out in the California Toxics Rule ("CTR"), 40 C.F.R. 131.38, *see also* 65 Fed. Reg. 31712 (May 18, 2000), which apply to the Receiving Waters except for impairments/pollutants being addressed by a TMDL or similar instrument (e.g., Site Specific Objectives);

(2) all numeric objectives contained in the Basin Plan or subsequent amendments;

(3) all narrative objectives contained in the Basin Plan or subsequent amendments (e.g., "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life." Basin Plan at 3-38).

115. Storm water discharges with pollutant concentrations that cause or contribute to an exceedance of any applicable water quality standards are violations of the General Permit and the Act.

116. The Basin Plan and California Toxics Rule set applicable water quality standards for storm water discharges from the Facility containing pollutants not addressed by the Dominguez/Harbor Waters TMDL, including without limitation arsenic, beryllium, cadmium, hexavalent chromium, nickel, and mercury.

117. The California Toxics Rule sets numeric criteria for 23 priority toxic pollutants to protect aquatic life and for 57 priority toxic pollutants to protect human health based on the U.S. EPA Administrator's determination that such numeric criteria are necessary in the State of California to protect human health and the environment. 65 FR 31681 (May 18, 2000); *see also* 40 C.F.R. § 131.2 ("Such standards [] serve as the regulatory basis for the establishment of water-quality-based treatment controls and strategies beyond the technology-based levels of treatment required by sections 301(b) and 306 of the Act."

118. The General Permit's second water quality-based effluent limitation is that pollutant concentrations in storm water discharges shall "not adversely impact

human health or the environment." General Permit, § VI.B.

119.   Storm water discharges with pollutant concentrations that adversely impact human health or the environment are violations of the General Permit and the Act.

120.   The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit, § VI.C.

121.   Storm water discharges with pollutant concentrations that threaten to cause pollution or a public nuisance are violations of the General Permit and the Act.

122.   Polluted storm water and non-storm water discharges from the Facility harm use and enjoyment of the Receiving Waters for recreational, aesthetic, spiritual, and other activities by LA Waterkeeper members and the public.

123.   Permittees are required to complete Water Quality Based Corrective Actions when industrial storm water discharges contain pollutant concentrations that violate Receiving Water Limitations. General Permit, § XX.B.

124.   Water Quality Based Corrective Actions include without limitation:

(1) an evaluation of pollutant sources and Best Management Practices implementation;

(2) assessment of whether additional measures are necessary to reduce or prevent pollutant discharge; and

(3) certification that all additional measures necessary to meet Receiving Water Limitations have been identified and included in the facility's Pollution Prevention Plan. *See* General Permit, § XX.B.1.a–c.

125.   Failure to comply with Water Quality Based Corrective Action requirements is an independent violation of this General Permit. General Permit, Fact Sheet II.E.1.

126.   Compliance with the General Permit's Water Quality Based Corrective Actions is an independent mandate, and does not excuse or otherwise impact a permittee's liability for the underlying violations of the Receiving Water Limitations.

### C.   Storm Water Pollution Prevention Plan Requirements

127.   The General Permit requires permittee facilities to develop and implement a Storm Water Pollution Prevention Plan ("Pollution Prevention Plan") prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ I.I.54, X.B.

128.   "Failure to develop or implement an adequate [Pollution Prevention Plan], or update or revise an existing [Pollution Prevention Plan] as required, is a violation of this General Permit." General Permit, Fact Sheet § II.I.1.

129.   The objectives of Pollution Prevention Plans are: (1) to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and non-storm water discharges; and (2) to describe and detail site-specific Best Management Practices to reduce or prevent pollutant concentrations in storm water discharges to levels that comply with the General Permit's technology-based and water quality-based effluent limitations. General Permit, § X.C.

130.   Each Pollution Prevention Plan must include the following elements, among others:

(1) a narrative description and assessment of all industrial activities,

potential sources of pollution, and pollutants associated with each potential source;

(2) identification and location where materials are being shipped, received, stored, and handled, as well as the typical quantities of such materials and the frequency with which they are handled;

(3) a description of dust and particulate generating activities;

(4) a site map including all areas of industrial activity subject to the General Permit that depicts the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, pollutant control measures, and municipal storm drain inlets that may receive the facility's discharge;

(5) a detailed description of the Best Management Practices developed and implemented, as well as a justification for Best Management Practices that are not being implemented;

(6) identification of areas of the Facility where the minimum Best Management Practices do not adequately reduce or prevent pollutants in storm water discharges and advanced Best Management Practices to be implemented in those areas;

(7) identification of unauthorized non-stormwater discharges; and

(8) identification of persons and their current responsibilities for developing and implementing the Pollution Prevention Plan.

131.   Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each Pollution Prevention Plan for their potential contribution of pollutants in storm water

discharges. General Permit, §§ X.C, X.F, X.G.

132.   Pollution Prevention Plans must be evaluated and revised as necessary, and on at least an annual basis, to ensure ongoing compliance. General Permit, § X.B.

133.   Mitsubishi's failure to develop, implement, or revise a comprehensive Pollution Prevention Plan that contains all required elements is a violation of the General Permit, and establishes liability under the Act. General Permit, § X.B; *see also* General Permit, Factsheet § II.I.1.

**D.    The General Permit's Monitoring and Reporting Requirements**

134.    All NPDES permits shall contain water quality monitoring requirements sufficient to assure compliance with permit technology- and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2); ; 40 C.F.R. § 122.44(i)(1) ("[E]ach NPDES permit shall include . . . monitoring requirements . . . to assure compliance with permit limitations.").

135.   Permittees must develop a written plan containing the permittee facility's monitoring and reporting program ("Monitoring Implementation Plan") to be included in the Pollution Prevention Plan prior to conducting, and in order to lawfully continue, industrial activities. General Permit, §§ X.I, XI.

136.   The objective of the Monitoring Implementation Plan is to detect and measure concentrations of pollutants in a facility's storm water discharges to assess compliance with the General Permit's substantive requirements, including the technology-based BAT/BCT standards, and water quality-based effluent limitations. General Permit, Factsheet § II.J.1.

137.   Information derived from the Monitoring Implementation Plan informs

each permittee as to whether it must adapt Best Management Practice design and/or implementation to ensure that storm water and non-storm water discharges comply with the General Permit. General Permit, §§ X.I, XI.

138.   The Monitoring Implementation Plan is an essential component in the General Permit's mandatory iterative self-evaluation process whereby permittees must implement Best Management Practices contained in the Pollution Prevention Plan, evaluate Best Management Practice effectiveness using visual observation and storm water sampling data, and then revise Best Management Practices as necessary to consistently comply with the General Permit's technology-based and water quality-based effluent limitations. *See* 33 U.S.C. § 1342(a)(2).

139.   Permittees that fail to develop and implement an adequate Monitoring Implementation Plan that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

140.   The CWA requires the collection and analysis of storm water discharge samples sufficient to determine compliance with all permit limits. General Permit, § XI.B; *NRDC v. County of L.A.*, 725 F.3d 1194, 1208 (9th Cir. 2013) ("[T]he Clean Water Act *requires* every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit." (emphasis in original)).

141.   The General Permit requires permittees to collect storm water samples from each location where storm water is discharged from its facility. General Permit, § XI.B.4–5.

142.   The General Permit requires permittees to collect and analyze storm

water samples from two Qualifying Storm Events ("QSEs") between July 1 and December 31 of each reporting year and two (2) Qualifying Storm Events between January 1 and June 30 of each reporting year. General Permit, § XI.B.2.

143.   A Qualifying Storm Event is a precipitation event that: (a) produces a discharge from at least one drainage area at the permittee facility; and (b) is preceded by forty-eight (48) hours with no discharge from any drainage area. General Permit, § XI.B.1.

144.   Each sample must be collected within four (4) hours of the start of a discharge, or the start of facility operations if the Qualifying Storm Event occurs within the 12-hour period prior to business hours. General Permit, § XI.B.5.

145.   The General Permit requires permittees to analyze samples for, among other parameters:

(1) conventional pollutants (pH, total suspended solids, and either total organic carbon or oil and grease) (§ XI.B.6.a–b);

(2) facility-specific pollutants identified in the pollutant source description and evaluation process (§ XI.B.6.c);

(3) Standard Industrial Classification code-based parameters listed in the General Permit at Table 1, such as nitrate plus nitrite ("N+N") for Standard Industrial Classification Code 1442 and iron for Standard Industrial Classification Code 3271 (§ XI.B.6.d);

(4) parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads, such as copper, zinc, and lead, for the Ports of Los Angeles and Long Beach Harbors (§ XI.B.6.e); and

(5) Regional Board-mandated parameters, which are any additional pollutants identified by the relevant Regional Board (§ XI.B.6.f).

146.   The General Permit requires permittees to submit all sampling and analytical results for every sample via the State Board's online reporting system within thirty (30) days of obtaining each analytical report from a certified laboratory. General Permit, § XI.B.11.a.

147.   Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. General Permit, § XI.A.

148.   Records of visual observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. General Permit, § XI.A.2.

149.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in storm water discharges. General Permit, § XI.A.3.

**E.    Numeric Action Levels and Exceedance Response Actions**

150.   The General Permit requires permittees to take corrective action in response to monitoring data that demonstrates that pollutant concentrations in storm water discharged from its facility exceed Numeric Action Levels ("NALs"). General Permit, § XII.

151.   Annual Numeric Action Levels are similar to, and derive from, U.S. EPA Benchmarks. General Permit, Fact Sheet, § I.D. Some of the annual Numeric Action Levels applicable to the Facility are summarized in Table 2.

**TABLE 2**
NUMERIC ACTION LEVELS APPLICABLE TO THE FACILITY'S DISCHARGES

| POLLUTANT | 2014 NAL | 2018 NAL |
|-----------|----------|----------|
| TSS | 100 mg/L | 100 mg/L |
| copper | 0.0332 mg/L | 0.0332 mg/L |
| lead | 0.262 mg/L | 0.262 mg/L |
| zinc | 0.26 mg/L | 0.26 mg/L |
| N+N | 0.68 mg/L | 0.68 mg/L |

152.   A Numeric Action Levels exceedance occurs when the average of all sampling data for a given pollutant from a reporting year exceeds the Numeric Action Level assigned to that pollutant, i.e. if the average concentration from three samples of zinc is 0.52 mg/L (e.g., 0.26 mg/L, 0.52 mg/L, and 0.78 mg/L). General Permit, § XII.A.1.

153.   Numeric Action Level exceedances operate as a signal to owners/operators, state agencies, and the public that a permittee's Best Management Practices are patently deficient, and therefore immediate remedial actions are required. General Permit, § XII.A.

154.   However, the Numeric Action Levels "are not intended to serve as technology-based or water quality-based numeric effluent limitations. The [Numeric Action Levels] are not derived directly from either BAT/BCT requirements or receiving water objectives. [Numeric Action Levels] exceedances defined in this General Permit are not, in and of themselves, violations of this General Permit." General Permit, § I.N.77.

155.   The General Permit requires a permittee with Numeric Action Level exceedance(s) to develop and implement Exceedance Response Action ("ERA")

procedures. General Permit, § XII.

156.   The first time a permittee's storm water sampling data demonstrates an exceedance of a Numeric Action Level, its compliance status changes from Baseline to Level 1 on July 1 following the reporting year during which the exceedance(s) occurred. General Permit, § XII.C.

157.   At Level 1 status, a permittee must: evaluate and revise, as necessary, its Best Management Practices with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP") by October 1; and submit an Exceedance Action Report prepared by the Qualified Industrial Stormwater Practitioner by January 1. General Permit, § XII.C.

158.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 Exceedance Response Action report has been completed, all identified additional Best Management Practices have been implemented, and results from four (4) consecutive subsequent qualified storm events sampled indicate no additional NAL exceedances for that parameter. General Permit, § XII.C.2.b.

159.   A discharger's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate a Numeric Action Level exceedance for that same parameter while the Discharger is in Level 1. Level 2 status will commence on July 1 following the reporting year during which the additional Numeric Action Level exceedance(s) occurred. General Permit, § XII.D.

160.   Dischargers with Level 2 status must certify and submit a Level 2 Exceedance Response Action Plan prepared by a Qualified Industrial Stormwater Practitioner that addresses each new Level 2 Numeric Action Level exceedance by

January 1 following the year Level 2 status is assigned. General Permit, § XII.D.1.a.

161.   All elements of the Level 2 Exceedance Response Action Plan must be implemented as soon as practicable and completed no later than 1 year after submitting the Level 2 Exceedance Response Action Plan. General Permit, § XII.D.1.d.

162.   On January 1 of the year following the submittal of the Level 2 Exceedance Response Action Plan, the discharger with Level 2 status must certify and submit a Level 2 Exceedance Response Action Technical Report prepared by a Qualified Industrial Stormwater Practitioner. General Permit, § XII.D.2.

163.   A discharger's failure to comply with mandatory corrective action process triggered by entering Level 1 or Level 2 status is a violation of the General Permit and the Act. General Permit, § I.N.76, Fact Sheet § K.2.b ("[I]t is a violation of the permit [] to fail to comply with the Level 1 status and Level 2 status ERA requirements in the event of [] exceedances.")

164.   However, compliance with the Exceedance Response Action requirements does not shield a permittee from liability for violations of the General Permit's technology-based or water quality-based mandates, and does not excuse past or ongoing violations of the General Permit's pollution prevention mandates.

### F. The General Plan's Annual Comprehensive Facility Compliance Evaluation Requirement

165.   Permittees must complete an Annual Comprehensive Facility Compliance Evaluation ("Annual Compliance Evaluation") each reporting year. General Permit, § XV. The goal of the Annual Compliance Evaluation is to ensure

1  and certify compliance with each of the General Permit's other mandates.

2         166.   The Annual Compliance Evaluation must include, at a minimum:

3                (1) a review of all sampling, visual observation, and inspection records

4  conducted during the previous year;

5                (2) an inspection of all areas of industrial activity and associated

6  pollutant sources for evidence of pollutants entering the storm water conveyance

7  system;

8                (3) an inspection of all drainage areas previously identified as having no

9  exposure to industrial activities;

10               (4) an inspection of equipment needed to implement Best Management

11 Practices;

12               (5) an inspection and evaluation of all Best Management Practices for

13 proper design, implementation, and adequate reduction/prevention of pollutants in

14 storm water discharges;

15               (6) a determination of whether additional Best Management Practices are

16 needed to comply with the General Permit; and

17               (7) an assessment of any other factors needed to comply with the

18 requirements of Section XVI.B (Annual Report mandates). General Permit, § XVI.

19        167.   The General Permit requires permittees to submit a Compliance

20 Checklist with each Annual Report that contains the following:

21               (1) an indication of whether the permittee complies with, and has

22 addressed all applicable requirements of, the General Permit;

23               (2) an explanation for any noncompliance with requirements within the

1    Reporting Year, as indicated in the Compliance Checklist;

2                  (3) an identification, including page numbers and/or sections, of all

3    revisions made to the Pollution Prevention Plan within the Reporting Year; and

4                  (4) the date(s) of the annual Compliance Evaluation.

5         168.   Any person who knowingly makes any false material statement,

6    representation, or certification in any record or other document submitted or required

7    to be maintained under this General Permit, including reports of compliance or

8    noncompliance shall upon conviction, be punished by a fine of not more than

9    $10,000.00 or by imprisonment for not more than two years or by both. General

10   Permit, § XXI.N.

11   **V.    STATEMENT OF FACTS**

12        **A. The Facility**

13        169.   Mitsubishi is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

14        170.   Mitsubishi is the legally responsible operator of the Facility.

15        171.   Mitsubishi first enrolled the Facility in the General Permit on June 23,

16   2015.

17        172.   Mitsubishi lists the Facility address as 1150 Pier F Avenue at the Port of

18   Long Beach in Long Beach, California in all permit registration documents it has

19   submitted to the State Board and Regional Board.

20        173.   Mitsubishi's permit registration documents state that the Facility operates

21   from 7:00am to 3:00am seven (7) days per week when actively unloading ships, and

22   from 7:00am to 7:00pm for truck loading Monday through Friday.

23        174.   The Facility is approximately 4.2 acres.

175.   The Facility is 100% impervious.

176.   The Facility's primary industrial activities include receiving and distributing cementitious material.

177.   Mitsubishi imports as much as 80,000 metric tons of cement, fly ash, and other cementitious materials ("Cement") into the Facility each month.

178.   At the facility, cement is unloaded from ships by pneumatic unloaders into a storage warehouse, which has a rated capacity of 54,000 metric tons.

179.   Cement is moved from the warehouse to the truck loading bins/silos by pump.

180.   Customer trucks are loaded on one of three (3) seventy-foot scales equipped with automatic card readers.

181.   According to Mitsubishi, the "[F]acility's drainage pattern and storm drain network direct all site-related runoff to a single discharge point on the south side of the site."

182.   Storm water flows containing pollutants originating from areas at the Facility where Mitsubishi conducts industrial activities are discharged from at least one discharge point to the "Receiving Waters."

183.   The greater Los Angeles and Long Beach Harbor Waters, including the "Inner Harbor," are waters of the United States.

184.   The Pacific Ocean is a water of the United States.

185.   Each industrial process undertaken by Mitsubishi at the Facility, including without limitation those industrial activities described in paragraphs 176, 177, 178, 179, and 180 has the potential to generate pollutants that will contaminate

its storm water discharges, which flow directly and indirectly into the Receiving Waters.

The Facility's sampling data establishes that storm water discharges into the Receiving Waters contain copper, zinc, and total suspended solids, among other pollutants. See EXHIBIT 1 (at Appendix 1-Summary of Storm Water Quality Data).

186.    Polluted storm water discharges from Standard Industrial Classification 3241 hydraulic cement, such as those conducted at the Facility, can also contain pH affecting substances, chemical oxygen demand, potassium, sulfate, oil and grease, among other pollutants. *See* U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector E: Glass, Clay, Cement, Concrete, and Gypsum Product Manufacturing Facilities* 2–3 (Feb. 2021), https://www.epa.gov/sites/default/files/2015-10/documents/sector_e_glass.pdf.

187.    Aluminum, iron, copper, lead, petroleum oils/fuels, and compounds affecting pH levels are pollutants associated with industrial activities conducted at the Facility.

188.    On information and belief cement, aluminum, iron, copper, lead, zinc, petroleum oils/fuel, and compounds affective pH levels are discharged with storm water to the Receiving Waters from the Facility.

189.    Fly ash is present at the Facility.

190.    Fly ash is used in industrial activities at the Facility.

191.    The specific chemical composition of fly ash varies depending on the coal bed from which it was derived. Fly ash commonly contain the following pollutants: gallium, arsenic, beryllium, boron, cadmium, chromium, hexavalent chromium, cobalt, lead, manganese, mercury, molybdenum, selenium, strontium, thallium, and

vanadium, along with very small concentrations of dioxins and PAH compounds.

192.   Mitsubishi has eight (8) active permits issued by the South Coast Air Quality Management District related to emissions-generating industrial activities and the operation of emissions control devices at the Facility.

193.   Particles emitted into the air as a result of industrial activities at the Facility are deposited directly into the Receiving Waters, and settle onto exposed surfaces at the Facility and are discharged to the Receiving Waters by rainwater during storm events.

194.   Mitsubishi reports to the South Coast Air Quality Management District that the Facility emits Polycyclic Aromatic Hydrocarbons, a class of chemicals which includes Chrysene (C1–C4) and Benzo(a)pyrene, both of which are listed as contributing to impairments in the Receiving Waters.

195.   Mitsubishi reports that the Facility also emits 1,3-butadiene, ammonia, arsenic, benzene, cadmium, carbon monoxide, chromium (VI), formaldehyde, lead (inorganic), naphthalene, nickel, nitrogen oxides, particulate matter, reactive organic gases, sulfur oxides, total suspended particulates.

196.   The most recent Annual Emissions Reports filed with the South Coast Air Quality Management District, in 2010, confirms that the Facility's industrial activities emit a variety of conventional and toxic pollutants.

**B. Stormwater Pollution Prevention Plans**

197.   Publicly available Pollution Prevention Plans from 2015, 2017, 2020, and 2021 demonstrate that Mitsubishi has failed, and continues to fail, to develop, implement, and/or revise a legally adequate Pollution Prevention Plan.

198.   Patently deficient areas of each of Mitsubishi's Pollution Prevention Plans include, without limitation:

(1) Site maps with all required elements (*see* General Permit, §§ X.A.2, X.E.3);

(2) Descriptions or narrative assessments of potential pollution sources, including but not limited to dust and particulate generating sources, vehicle and equipment maintenance, or fueling activities (§ X.G);

(3) Descriptions, evaluations, justifications, and revisions of Best Management Practices to ensure compliance with BAT/BCT standards (§ X.H.4.a–b);

(4)  Monitoring Implementation Plan prompting analysis of storm water samples for all parameters potentially present in storm water discharges. (§ XI.B.6).

199.   Every day the Facility operates with an inadequately developed, implemented, and/or properly revised Pollution Prevention Plans is a separate and distinct violation of the General Permit and Act.

200.   These violations are ongoing, and LA Waterkeeper will include additional violations as information becomes available.

**C. Monitoring Implementation Plans**

201.   Mitsubishi has conducted and continues to conduct industrial activities at the Facility without developing, implementing, or revising a Monitoring Implementation Plan that complies with the General Permit's requirements.

202.   On information and belief, Mitsubishi personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's

industrial storm water discharges during the 2017-2018 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

203.   On information and belief, Mitsubishi personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018-2019 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

204.   On information and belief, Mitsubishi personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019-2020 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

205.   On information and belief, Mitsubishi personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020-2021 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

206.   On information and belief, Mitsubishi personnel did not conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022-2023 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

207.   Failures to conduct visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges evidence inadequate Monitoring Implementation Plan development and implementation.

208.   On information and belief, Mitsubishi personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's

industrial storm water discharges during the 2017-2018 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

209.   On information and belief, Mitsubishi personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2018-2019 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

210.   On information and belief, Mitsubishi personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2019-2020 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

211.   On information and belief, Mitsubishi personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2020-2021 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

212.   On information and belief, Mitsubishi personnel did not record visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2021-2022 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

213.   On information and belief, Mitsubishi personnel has not recorded visual observations of all areas of industrial activity and areas impacted by the Facility's industrial storm water discharges during the 2022-2023 permit term as required by the General Permit. *See* General Permit, § XI.B.4.

214.   Mitsubishi's failure to record visual observations of all areas of industrial

activity and areas impacted by the Facility's industrial storm water discharges further evidences inadequate Monitoring Implementation Plan development and implementation.

215.  Public weather data establish that the Facility has collected and analyzed storm water samples from storm event that do not meet the definition of a Qualifying Storm Event, including without limitation on January 5, 2017, January 9, 2018, January 14, 2019, January 31, 2019. *See* EXHIBIT 1 (at Appendix 2-List of Qualifying Storm Events from January 2016–June 2021).

216.   Public weather data establish that the Facility failed to collect sufficient storm water samples during Qualifying Storm Events taking place on dates and at times when the Facility was open. *See* EXHIBIT 1 (at Appendix 2-List of Qualifying Storm Events from January 2016–June 2021).

217.  Mitsubishi's failure to collect sufficient samples from Qualifying Storm Events further evidences inadequate Monitoring Implementation Plan development and implementation.

218.  On information and belief, Mitsubishi has failed to collect storm water samples from all storm water discharge points, including, but not limited to, the locations where storm water discharges from the Facility's driveway to the street, or anywhere necessary to assess efforts to mitigate trackout.

219.  Mitsubishi's failures to collect storm water samples from all storm water discharge points further evidence inadequate Monitoring Implementation Plan development and implementation.

220.  On information and belief, Mitsubishi has failed to analyze samples for

all pollutants required by the General Permit, including without limitation various pollutants present in fly ash, pollutants commonly associated with industrial activities conducted at the Facility (e.g., aluminum, iron), and pollutants emitted during industrial activities from the Facility. General Permit § XI.B.6.

221.   Mitsubishi's failures to analyze storm water samples for all required pollutants further evidence inadequate Monitoring Implementation Plan development and implementation.

### D. Stormwater Sample Collection and Analysis

222.   The storm water sample collected by Mitsubishi at the Facility's sampling point on April 6, 2020 contained copper concentrations of 0.0084 mg/L, which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

223.   The storm water sample collected by Mitsubishi at the Facility's sampling point on April 6, 2020 contained zinc concentrations of 0.17 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

224.   The storm water sample collected by Mitsubishi at the Facility's sampling point on December 28, 2020 contained copper concentrations of 0.039 mg/L, which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

225.   The storm water sample collected by Mitsubishi at the Facility's sampling point on December 28, 2020 contained zinc concentrations of 0.75 mg/L, which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

226.   The storm water sample collected by Mitsubishi at the Facility's sampling point on December 28, 2020 contained total suspended solids concentrations of 190 mg/L, which exceeds the 100 mg/L U.S. EPA Benchmark for total suspended

1   solids.

2        227.   The storm water sample collected by Mitsubishi at the Facility's

3   sampling point on March 3, 2021 contained copper concentrations of 0.054 mg/L,

4   which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

5        228.   The storm water sample collected by Mitsubishi at the Facility's

6   sampling point on March 3, 2021 contained zinc concentrations of 0.43 mg/L, which

7   exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

8        229.   The storm water sample collected by Mitsubishi at the Facility's

9   sampling point on March 15, 2021 contained copper concentrations of 0.036 mg/L,

10  which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

11       230.   The storm water sample collected by Mitsubishi at the Facility's

12  sampling point on March 15, 2021 contained zinc concentrations of 0.25 mg/L, which

13  exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

14       231.   The storm water sample collected by Mitsubishi at the Facility's

15  sampling point on October 25, 2021 contained copper concentrations of 0.044 mg/L,

16  which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

17       232.   The storm water sample collected by Mitsubishi at the Facility's

18  sampling point on October 25, 2021 contained zinc concentrations of 0.38 mg/L,

19  which exceeds the 0.09 mg/L U.S. EPA Benchmark for zinc.

20       233.   The storm water sample collected by Mitsubishi at the Facility on

21  December 27, 2022 contained copper concentrations of 0.15 mg/L, which exceeds the

22  0.0048 mg/L U.S. EPA Benchmark for copper.

23       234.   Another storm water sample by Mitsubishi at the Facility on December

27, 2022 contained copper concentrations of 0.15 mg/L, which exceeds the 0.0048 mg/L U.S. EPA Benchmark for copper.

235.   The storm water sample collected by Mitsubishi at the Facility on December 27, 2022 contained oil and grease concentrations of 30.2 mg/L, which exceeds the 15 mg/L U.S. EPA Benchmark for oil and grease.

236.   A true and accurate summary of the data (as reported by Mitsubishi to the State Board via the SMARTS database) that is the basis for allegations contained in paragraphs 222 to 232 is contained in EXHIBIT 1 (at Appendix 1-Summary of Storm Water Quality Data) attached to, and incorporated by reference into, this Complaint.

237.   Every single storm water sample analyzed since April 2020 contains copper and zinc concentrations that exceed the U.S. EPA Benchmarks for those pollutants.

238.   Exceedances of U.S. EPA Benchmarks evidence failures to develop, implement, and/or maintain Best Management Practices for the Facility that achieve BAT/BCT-level pollutant concentrations.

239.   The Facility is currently at Level 1 status for total suspended solids, zinc, and copper.

240.   Monitoring data summarized in EXHIBIT 2 (at Appendix 1-Summary of Storm Water Quality Data) also establishes consistent exceedances of the numeric criteria for copper and zinc established in the California Toxics Rule for the protection of aquatic life and human health.

241.   Storm water discharges containing pollutant concentrations that exceed California Toxics Rule violate the narrative objective contained in or amended into

the Basin Plan that prohibits discharges that produce detrimental physiological responses in human, plant, animal, or aquatic life.

242.   Storm water discharges containing pollutant concentrations that exceed California Toxics Rule numeric criteria adversely impact human health and the environment.

243.   Mitsubishi has not submitted any reports as required by the General Permit's Water Quality Based Corrective Action requirements despite evidence establishing violations of multiple water quality-based effluent limitations.

**E. BAT/BCT and Best Management Practices**

244.   On information and belief, Mitsubishi has failed to implement minimum and advanced Best Management Practices employed by similar industrial facilities representing BAT/BCT.

245.   Mitsubishi's pattern of exceeding U.S. EPA Benchmarks demonstrates that the Facility is operating with BMPs that are insufficient and/or ineffective to meet the BAT/BCT standard.

246.   Mitsubishi has not sufficiently evaluated and amended Best Management Practices in response to Exceedance Response Actions status and Annual Comprehensive Facility Compliance Evaluations, as required by the General Permit.

247.   Best Management Practices implemented by Mitsubishi at the Facility have not prevented, and will not prevent, the Facility's pollutant sources from contributing pollutants to storm water discharged to waters of the United States that violate the technology-based and water quality-based effluent limitations.

248.   Each day Mitsubishi operates the Facility without BMPs achieving

BAT/BCT-level pollutant reductions is a separate and distinct violation of the General Permit's technology-based effluent limitations and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

249.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**F.  Receiving Water Limitations**

250.   Mitsubishi has violated and continues to violate the General Permit's Receiving Water Limitations. General Permit § VI.A-C.

251.   Mitsubishi's storm water sampling data establishes that the Facility is causing and/or contributing to violations of applicable WQSs in violation of the General Permit's Receiving Water Limitation. General Permit § VI.A-C.

252.   Mitsubishi has violated and continues to violate the General Permit's water quality-based effluent limitations. General Permit § VII.A.

253.   Mitsubishi has not, to LA Waterkeeper's knowledge based on publicly available records, taken any corrective action to remedy these ongoing violations of the General Permit's Receiving Water Limitation or water quality-based effluent limitations. See General Permit, § XX.B.1.

254.   Mitsubishi is liable for violations of the Act and General Permit's Receiving Water Limitations for each day of significant rainfall from November 18, 2017 to the present, and for violations of related remedial mandates on an ongoing basis. *See* EXHIBIT 1 (at Appendix 2-List of Qualifying Storm Events from January 2016–June 2021).

255.   Mitsubishi is liable for violations of the Act and General Permit's water

quality-based effluent limitations for each day of significant rainfall from November 18, 2017 to the present, and for violations of related remedial mandates on an ongoing basis. *See* EXHIBIT 1 (at Appendix 2-List of Qualifying Storm Events from January 2016–June 2021).

256.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**G. Exceedance Response Actions**

257.   Mitsubishi failed to complete an evaluation of the Facility, and then to prepare and submit a Level 1 ERA Report by January 1, 2021. *See* General Permit, § XII.C.2.

258.   A review of the Level 1 ERA Report ultimately submitted in December 2021, as well as storm water monitoring data from 2021, demonstrate that the report does not identify additional BMPs necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

259.   A discharger that is not in full compliance with the Level 1 status and/or Level 2 status ERA requirements is in violation of the General Permit. General Permit, § I.N.77.

260.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

**H. Discharge Prohibitions**

261.   A review of all publicly available information establishes that Mitsubishi has and continues to violate the General Permit Discharge Prohibitions. *See* e.g., General Permit, §§ III.B and D.

262.   These violations are ongoing, and LA Waterkeeper will include additional violations when information becomes available.

## VI.        CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in Violation of the General Permit's Technology-Based Effluent Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

263.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

264.   Mitsubishi has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of Best Management Practices at the Facility that achieve the technology-based BAT/BCT treatment standards.

265.   Mitsubishi discharges storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

266.   Defendant's failures to develop and/or implement Best Management Practices that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility are violations of the General Permit's technology-based effluent limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

267.   Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are

1   discharged from the Facility.

2       268.   Each and every violation of the General Permit's technology-based

3   effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33

4   U.S.C. § 1311(a).

5       269.   Defendant's violations of the General Permit's technology-based effluent

6   limitations and the Act are ongoing and continuous.

7       270.    Mitsubishi is subject to an assessment of civil penalties for each and

8   every violation of the General Permit and Act occurring from November 18, 2017, to

9   the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d),

10  1365; 40 C.F.R. § 19.4.

11      271.   An action for injunctive relief is authorized by section 505(a) of the Act.

12  33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

13  would irreparably harm LA Waterkeeper and the residents of the State of California,

14  for which there is no plain, speedy, or adequate remedy at law.

15      272.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

16  because an actual controversy exists as to the rights and other legal relations of the

17  Parties.

18      WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set

19  forth hereafter.

20  ### SECOND CAUSE OF ACTION

21  **Defendant's Discharges of Contaminated Storm Water in Violation
of the General Permit's Water Quality-Based Effluent Limitations and the Act**

22  **(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

23      273.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as

1  if fully set forth herein.

2      274.  Since at least November 18, 2017, Defendant has discharged

3  contaminated storm water from the Facility containing levels of pollutants that cause

4  or contribute to exceedances of applicable water quality standards in violation of the

5  General Permit's water quality-based effluent limitations. *See* General Permit, § VI.A.

6      275.  Since at least November 18, 2017, Defendant has discharged

7  contaminated storm water from the Facility containing levels of pollutants that

8  adversely impact human health and the environment in violation of the General

9  Permit's water quality-based effluent limitations. *See* General Permit, § VI.B.

10      276.  Since at least November 18, 2017, Defendant has discharged

11  contaminated storm water from the Facility containing levels of pollutants that threaten

12  to cause pollution or a public nuisance in violation of the General Permit's water

13  quality-based effluent limitations. *See* General Permit, § VI.C.

14      277.  Since at least November 18, 2017, Defendant has discharged

15  contaminated storm water from the Facility containing concentrations of total

16  suspended solids above the effluent limitation implementing the interim WLA for

17  metals in the General Permit. General Permit § VII.A.

18      278.  LA Waterkeeper is informed and believes, and thereon alleges, that

19  discharges of storm water containing levels of pollutants that cause or contribute to

20  exceedances of applicable water quality standards, adversely impact human health

21  and/or the environment, and threaten to cause pollution or a public nuisance from the

22  Facility, occur each time storm water was/is discharged from the Facility.

23      279.  Defendant's violations of the General Permit's water quality-based

effluent limitations are ongoing and continuous.

280.   Each and every violation of any of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

281.   Every day, since at least November 18, 2017, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's water quality-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. *See* 33 U.S.C. § 1311(a).

282.   Mitsubishi is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from November 18, 2017, to the present, pursuant to sections 309(d) and 505 of the Act. *See* 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

283.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

284.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update
An Adequate Storm Water Pollution Prevention Plan**

**(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

285.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

286.   Defendant has not developed and implemented a legally adequate Pollution Prevention Plan for the Facility, including failing to comply with those requires detailed in paragraphs 130 through 133 of this Complaint.

287.   Defendant's violations of the General Permit's Pollution Prevention Plan requirements are ongoing and continuous.

288.   Each day since November 18, 2017, that Defendant has not developed, implemented, and reviewed and updated a legally adequate Pollution Prevention Plan for the Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

289.   Defendant has been in violation of the General Permit's Pollution Prevention Plan requirements every day since November 18, 2017. Violations continue each day that an adequate Pollution Prevention Plan for the Facility is not developed and fully implemented.

290.   Mitsubishi is subject to an assessment of civil penalties for each and every violation of the Act occurring from November 18, 2017, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

291.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

292.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a)

1 because an actual controversy exists as to the rights and other legal relations of the

2 Parties.

3      WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set

4 forth hereafter.

5 ### **FOURTH CAUSE OF ACTION**

6 **Defendant's Failure to Develop and Implement**
**An Adequate Monitoring Implementation Plan**

7 **(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

8      293.   LA Waterkeeper re-alleges and incorporates all preceding paragraphs as

9 if fully set forth herein.

10      294.   Defendant has failed to collect storm water samples from all discharge

11 points at the Facility as required by the General Permit.

12      295.   Defendant has failed to collect storm water samples as required by the

13 General Permit, including without limitation failing to collect sufficient samples

14 during qualifying storm events during the 2018-2019, 2019-2020, 2020-2021, 2021-

15 2022, and 2022-2023 storm water years.

16      296.   Defendant has failed to analyze all storm water samples collected at the

17 Facility for all pollutant required by the General Permit, including without limitation

18 arsenic, cadmium, chromium (VI), copper, lead, nickel, and zinc.

19      297.   Defendant has failed to comply with the General Permit's Water Quality

20 Based Corrective Actions. General Permit, § XX.B.

21      298.   Defendant has not developed and implemented a legally adequate

22 monitoring and reporting program, or Monitoring Implementation Plan, for the

23 Facility.

299.   Defendant's violations of the General Permit's Monitoring Implementation Plan mandate are ongoing and continuous.

300.   Each day since November 18, 2017, that Defendant has not developed and implemented a lawful Monitoring Implementation Plan for the Facility and all areas of industrial activity in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

301.   Mitsubishi is subject to an assessment of civil penalties for each and every violation of the Act occurring from November 18, 2017, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

302.   An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

303.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                            55

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.      Declare Defendant to have violated, and to be in violation of, the General Permit and Act as alleged herein;

b.      Enjoin Defendant from discharging polluted storm water from the Facility except as authorized by the General Permit;

c.      Order Defendant to immediately implement storm water pollution control technologies and measures that achieve BAT/BCT-level pollutant reductions, and that prevent pollutants in the Facility's storm water discharges from contributing to violations of any water quality standards;

d.      Order Defendant to prepare a Pollution Prevention Plan consistent with the General Permit's requirements, and implement procedures to regularly review and update the Pollution Prevention Plan to ensure ongoing compliance with Pollution Prevention Plan requirements;

e.      Order Defendant to prepare a Monitoring Implementation Plan consistent with the General Permit's requirements, and comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.      Order Defendant to pay civil penalties of up to $59,973.00 for each violation alleged herein pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–.4;

g.      Order Defendant to take appropriate actions to restore the quality of waters

1   impaired or adversely affected by its activities;

2       h.      Award Plaintiff's costs (including reasonable investigative, attorney,

3   witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

4   § 1365(d); and,

5       i.      Award any such other and further relief deemed appropriate by the Court.

6

7   DATED: January 23, 2023              Respectfully submitted,

8
                                 By:    /s/ Jesse C. Swanhuyser
9                                       Jesse C. Swanhuyser
                                        SYCAMORE LAW, INC.
10                                      Attorney for Plaintiff

11

12

13

14

15

16

17

18

19

20

21

22

23